## GULF, C. & S. F. RY. CO. v. BESSER.
### (No. 4.)

(Court of Civil Appeals of Texas. Beaumont. Oct. 28, 1915. Rehearing Denied Nov. 11, 1915.)

1. MASTER AND SERVANT ☞300—TORTS OF SERVANT—INJURIES TO THIRD PERSONS—LIABILITY.

A master is liable for the wrongful acts of his servant done in the course of employment.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 1209; Dec. Dig. ☞300.]

2. MASTER AND SERVANT ☞302 — TORTS OF SERVANT—LIABILITY—AUTHORITY.

Where a servant has authority to do a certain thing, and in doing it does a wrong, the master is liable therefor, but not if the servant does not act in the master's interest or within the scope of his authority.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 1217–1221, 1225, 1229; Dec. Dig. ☞302.]

3. MASTER AND SERVANT ☞306—INJURIES TO THIRD PERSONS—TORTS OF SERVANT.

A master is not liable for injury due to wrongful or malicious acts of his servant not done in the course of his employment.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 1230–1232; Dec. Dig. ☞306.]

4. MASTER AND SERVANT ☞308—TORTS OF SERVANT—INTENT.

An express willful intent to do an injury, resulting in damages, cannot be imputed to the master when injury is inflicted by the employé, and the wrongful act is neither authorized nor ratified.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 1234; Dec. Dig. ☞308.]

5. FALSE IMPRISONMENT ☞39 — TORTS OF SERVANT—LIABILITY—QUESTION FOR JURY.

Evidence *held* sufficient to carry a case to the jury on the question of the liability of a master for the act of his servant in the alleged wrongful arrest and detention of the plaintiff.

[Ed. Note.—For other cases, see False Imprisonment, Cent. Dig. §§ 116–118; Dec. Dig. ☞39.]

Appeal from District Court, Montgomery County; J. Llewellyn, Judge.

Action by Hamilton Besser, by his next friend, against the Gulf, Colorado & Santa Fé Railway Company. From a judgment for

plaintiff, defendant appeals. Reversed and remanded.

W. N. Foster, of Conroe, and F. J. & C. T. Duff, of Beaumont, for appellant. Dean, Humphrey & Powell, of Huntsville, for appellee.

BROOKE, J. This case was tried upon the first amended original petition filed by J. I. Besser, as next friend of Hamilton Besser. Clause No. 1 of the petition sets up the residence of the parties and occupation of the defendant, which is admitted in the answer. The second, third, and fourth clauses of the petition set out plaintiff's cause of action, and, we set the same out in full:

Second. On or about the said December 19, 1912, at night, while plaintiff, with a number of his friends and companions of the Sweet Home Community, west of the town of Conroe, and in Montgomery county, Tex., were gathered at and near the Sweet Home Church in said community for the purposes of pleasure and amusement, and about 10 o'clock at night, one of the defendant's passenger trains was going west, and was by the defendant, its agents and servants in charge thereof, brought to a stop at, over, or near a community dirt road that crossed the defendant's track near Sweet Home Church, and the plaintiff and his companions were then near the right of way of defendant, conducting themselves in a lawful manner, when the defendant requested, induced, and procured one John McKinney, who was then and there armed with a pistol, to go out with the pistol in hand where the plaintiff and his companions were, on or near the right of way, and the said John McKinney, acting for and at the instance and as the agent and servant of the defendant, and acting by the procurement of the defendant as aforesaid, and the defendant acting by and through said McKinney, willfully, wickedly, oppressively, unlawfully, and without any probable cause assaulted and falsely arrested and took into custody this plaintiff, and caused and compelled this plaintiff and one of his companions to go to the train which had been stopped by the defendant, its agents and servants in charge thereof, and, when this plaintiff had been taken to the train which had been stopped as aforesaid, the defendant, acting by and through another agent and servant of the defendant, unlawfully, oppressively, and without any reasonable or probable cause whatever assaulted and took hold of the plaintiff and assisted the said John McKinney in putting plaintiff on the train, and the plaintiff was by the defendant, its agents and servants in charge of said train, forcibly compelled to enter a coach of defendant's said train, and was carried thereon to Keenan, a distance of several miles, and subjected to an inquisition as to certain depredations which the defendant claimed had been committed on its property—all of which was done without the consent of plaintiff, and against his will.

Third. The defendant's agents and servants aforesaid who arrested this plaintiff as aforesaid did so without any warrant of arrest, or other warrant or authority therefor, and without justification or lawful excuse, and the plaintiff at the time he was so arrested was conducting himself in a lawful manner.

Fourth. After the defendant, its agents and servants, had finished their inquiries of the plaintiff and their inquisitions upon him above mentioned, the defendant, its agents, and servants, released the plaintiff at said town of Keenan, where he had no friends or companions, and where he was several miles from his home, something like 10 o'clock at night. The plaintiff had left his hat in the Sweet Home Church, and, when released at Keenan, he was turned loose hatless and without money, and had no place to spend the night, and had to walk to his home, a distance of about six miles, at night and in the cold.

Plaintiff prays for actual damages in the sum of $2,500, and for exemplary damages in the sum of $2,500, and for cost of suit.

The defendant answered by general demurrer, which was urged and overruled by the court. Defendant further answered by general denial, save and except as to the admissions contained thereafter in its answer, and specifically answered as follows:

Defendant says that it denies that the plaintiff, with a number of friends and companions, on the date alleged in the second paragraph of plaintiff's petition, were gathered near Sweet Home Church for the purpose of pleasure and amusement, and defendant states that it is informed and believes, and so charges, that the plaintiff and his friends and companions were gathered near said Sweet Home Church and at the place where they were found for the unlawful purpose of stopping the passenger train of this defendant without any desire or intention of the plaintiff or any of his companions taking passage on said train, but for the malicious and mischievous purpose of rocking said train; that is, to throw rocks and other missiles against said train and through the windows thereof.

Defendant denies so much of paragraphs 2 and 3 as alleges that the agent and servants of this defendant willfully and falsely arrested and took into custody the plaintiff herein, or that the agents and servants of this defendant assaulted the plaintiff. In this connection this defendant upon information and belief alleges the facts to be as follows: The conductor of defendant's train had been informed that the plaintiff and other boys his age had on several occasions at this point thrown rocks and other substances at defendant's train while same were passing that point, and defendant's conductor was advised that his train would be rocked by plaintiff and his friends on this particular occasion. That defendant's conductor imparted this information to one John McKinney, who, defendant was informed, and believed at the time, was the sheriff of Grimes county. That, when defendant's train approached the point, it was understood that plaintiff and three or four other companions, using a torch, flagged and stopped defendant's passenger train, and, when they were approached by the said John McKinney, they ran and attempted to make their escape. The plaintiff and one of his companions were overtaken by John McKinney, and were carried by him on board of defendant's train, and were taken to the station of Keenan. Defendant says it is true, as it is informed and believes, that the said John McKinney and others asked plaintiff and his companions about their reason for flagging the train and throwing rocks at same. The plaintiff was not subjected to any harsh treatment or to any abuses by the said John McKinney or any one else. That the plaintiff and his companion were put off of the train at Keenan, a few miles from the point where they were found, and were told by defendant's conductor to remain at Keenan until next morning, when they would be taken back to the place from which they came. That the plaintiff informed the conductor that he was nearer home at Keenan than he was at Leonidas, the place where he was taken on the train, and that he preferred walking home to waiting over.

Defendant denies that any of its agents or employés did any act that was reasonably calculated to put plaintiff in fear or cause him humiliation. Defendant denies that any of the acts committed by John McKinney or any em-

ployé or agent of this defendant was done maliciously or through gross negligence.

Defendant says that it is informed, believes, and so charges that the arrest or taking in charge of plaintiff and his companions was done for the purpose of apprehending the parties, including the plaintiff, who were throwing rocks at the train, and who, on the occasion alleged in plaintiff's petition, had unlawfully flagged and stopped the passenger train, and who were at the time prepared and ready to throw rocks into and against said train. That said arrest or apprehending of said parties, including plaintiff, was not by any agent of defendant or by defendant's direction or .authority, nor were said acts ratified by defendant, nor were said acts within the scope of the employment of said agents and servants.

The case was tried before a jury on the 15th day of October, 1914. Appellant filed his motion for a new trial seasonably, which was overruled by the court, filed his bills of exception, and his appeal bond within the time prescribed by law, and brings the case to this court upon alleged errors. Appellant assails the action of the lower court in his first assignment of error, in failing and refusing to give his special charge to the jury, as follows:

"Now comes the defendant company, before the court had read its main charge to the jury, and requested the court to instruct the jury as follows: 'You are instructed in this case to return a verdict in favor of the defendant.'"

We do not believe that the court was warranted in instructing the jury to return a verdict for appellant, and therefore we overrule this assignment of error. Error is also predicated upon the action of the court in failing in his general charge to the jury to instruct them under what conditions this defendant would be liable for the acts of its servants, and in refusing to modify his general charge to meet said objections. The charge of the court in this connection reads as follows:

"That plaintiff was arrested and taken into custody by the defendant, and was taken to defendant's train, and that the agents and servants of defendants in charge of said train compelled the plaintiff to enter a coach of said train against his will and without his consent, and that the defendant, its agents and servants, carried the plaintiff on said train to Keenan, and there released the plaintiff and he had to walk home, etc., then you will find for the plaintiff."

The charge was properly excepted to, and a proper charge requested.

It is well known that a corporation can only act through its officers, agents, servants, and employés, and that, in order to render the master liable for the acts of its servants, agents, and employés, the act must be within the scope of the authority of the agent by virtue of his employment and in the furtherance of the master's business, or by virtue of express instructions to do the particular act or acts complained of. All the testimony submitted on the trial of this cause was that of the appellee himself, which was as follows:

"I live at Shiloh, in Montgomery county, Tex. Shiloh is west from Conroe. I do not know just how far it is, but think it is about eight or nine miles. I have lived in that community about four or five years. My father's name is J. I. Besser. I was sixteen years of age last January. I was at Sweet Home Church on the night of December 19, 1912. I was there for the purpose of practicing some pieces for a concert. I do not know exactly what time I got to the church, but it was some time after dark. I lived about three miles from the church, and I walked to the church that night. I disremember now whether any one went with me to the church or not. I was in the concert for which they were practicing, and I suppose there was some 50 or 75 in the concert. I saw the Santa Fé flyer as it went west that night. That was the train they taken me on. This was on the night of December 19, 1912. Just before the train reached the Sweet Home Community I was out across the railroad. I went out there to attend a call of nature. Claud Miller was with me. Jesse Johnson was also across the track. I crossed the track at the road crossing. This road leads to the Sweet Home Church, which is about fifty yards from the crossing in a northwest direction. I crossed over the track, and went on the south side of same. I was about twenty steps from the track on the south side when I saw the train coming. Claud Miller was with me. I had finished what I went there to do, and we were standing there talking, and were not paying any attention to the train, and when we started back to the track the train was so close that we did not want to cross ahead of it, and we waited for it to pass, and when it passed it stopped and picked us up. Q. Who picked you up? State the circumstances, all that happened. A. We were standing there, and Jesse Johnson was standing there, too. We were standing together, and the train stopped, and that fellow stepped off with the gun in his hand and asked what we were doing trying to rock the train, and Claud Miller told him, 'Nothing,' and he said, 'Come on here,' and Claud run, and Jesse Johnson started to run, and he grabbed him, and then he grabbed me, and then the conductor told him to put us on the train. Q. The man who took you in charge? A. Yes, sir. Q. What did he do with you? A. Taken us into the car and set us down and set in front of us and asked us our names and what the other boys' names were. Q. Did you tell them? A. Yes, sir. Q. What else? A. They asked us what we were doing, and we told them why we cross the railroad, a call of nature, and they asked us wasn't we trying to rock the train, and we said, 'No,' that we hadn't thought nothing about it, and then they asked us about flagging it, and we told them we didn't see nobody doing that. Q. Who was making the inquiries? A. The conductor. They took us to Keenan."

Being asked what was done with them then, the witness answered:

"The best that I could understand, he asked us if we wanted to get off, and we told him we were going to get off, and we went on out. I didn't hear him say anything else, and he lifted us down the steps and turned us loose. I don't know how far Keenan is from Sweet Home. It is about five or six miles. I had never been to Keenan before, and did not know the way back to Sweet Home. I went back on the railroad track. That was the only way I knew. I walked back down the railroad track. I did not have any money, and if he offered to take care of us, or to take us back, I did not hear him say anything about it. I walked back to Sweet Home Church, and Jesse went on to Johnson's and I went on home, first going through the church and getting my hat, which I had left in the church when I went across the track. I got home that night about midnight. Q. Tell the jury what effect it had on you. A. Frightened us, of course; scared us. I didn't know nothing about it, and hadn't never been arrested before. Q. Did you feel ashamed or humiliated by being arrested? A. Yes, sir. This all happened

on the 19th of December, 1912. It was a pretty dark night and cold. I lived about three miles from Sweet Home Church, and it was about six miles from Keenan to church."

Being asked whether he walked, ran, or trotted from the church home, he answered that he ran part of the way.

"I did not flag the train that night or the night before. 1 did not see anybody flag the train for it to stop. I did not have any rocks or anything like that, nor did the other boys have any rocks in their hands that I saw. None of them said anything to me about rocking the train. If they were aiming to do so, they would have said something to me, but they did not say anything to me about it. They did not say anything to me about it. I know Claud Miller did not. The concert was to be given Christmas night. On the night of the 18th I was at Shiloh, which is west from Sweet Home right up the graded road. They were having a road speaking at Shiloh that night. Mr. Potts spoke. I do not know where Jesse Johnson was on that night. So far as I know, he was not at Shiloh. I did not know any one at Kennan, and I had never been there before. I had no money with me. Jesse Johnson is also a boy."

Cross-examination:

"It has been so long ago that I do not know whether I went to the church from my home that night by myself or not. I may have done so, but it has been so long ago I disremember. I got there some time after dark. I do not know what time it was. The train came along about ten minutes after I left the church that night. I did not see the other train—I believe they call it the Boll Weevil—going towards Conroe, when it passed. Claud Miller and Jesse Johnson were all that were in the crowd with me when the train stopped—only three of us. I did not see any one striking matches and waving them in front of the train."

Being asked who it was talking to him after he got on the train, he answered: "The conductor." Being asked who it was that was first talking to him, and if he was sure it was the conductor, he answered he did not know who it was. "I had never been on a train; never rode on one before." It was then suggested to him that the conductor had a cap, and he was then asked did he mean the conductor did the talking with him before some one else had, to which he answered:

"Not as I remember. I disremember, but I know he talked some to us. The young man with me answered as many questions as I did. I do not know the man who wrote down our answers to the questions asked. There was a man taking down our names. I don't know whether he wrote down what we said or not. I did not tell Mr. Dunlap or Mr. McKinney anything about rocking the train. I gave them the names of Claud Miller, Jesse Johnson, and J. B. Besser, and my own name as parties who were there, and told them where these parties lived. Yes, sir; I gave them four names, but J. B. was not with us when we crossed the track. The reason I gave his name was because, when we was coming out to the track, we seen him about halfway from the crossing toward the track, and I gave in his name. I do not know anything about telling Mr. Dunlap that there were two boys they ought to have gotten. I do not remember telling him the names of two boys and telling him they were the main ones, and they should have gotten them. I told him that I had not thrown any rocks. Q. Didn't you tell him that he ought to have gotten the other two; that they were the main ones? A. I don't know whether I did or

not; I don't remember; I don't think I did. Q. You don't know whether you did or not? A. Don't think I did. I lived about six miles from Keenan, through the country. I do not know whether I have ever seen that gentleman [Mr. Dunlap, who was brought in and pointed out to witness] before or not; I do not know whether he was the man that was writing down my answers or not. I was scared. He sorter looks like the man. Q. Have you told all that was said and done to you there on that occasion? A. They asked us where we was at the night before, and we told them where we was at, and they said the train was rocked the night before, and we told them that we wasn't the ones that rocked it; that we wasn't there the night before. I did not tell them anything about who were the ones. I was on the north side of the track, and the church was on the south side of the track. When the conductor told the man to put us on the train, he was standing up in the end of the coach. I was not a passenger on the train that night, and did not intend to take passage on it. I was waiting for it to pass by."

Direct examination:

"I was taken without my consent and against my will. Q. You say that the conductor was standing at the end of the train? A. In the coach up in the steps on the platform. Q. The party that arrested you asked 'what to do with them,' and he said, 'Bring them on the train.' A. Yes, sir; and he taken us one in each hand and marched us up, and the conductor taken us on the train. Q. Who did that. A. Mc-Kinney. After he marched us up, the conductor taken possession of us."

Cross-examination: Upon being asked what he meant by "possession," he answered:

"He taken us on into the train and set down in front of us; gave us a seat and set down in front of us."

[1] It has been said, and truly so:

"That a master is liable for the wrongful acts of the servant done in the course of employment." Chandler v. Deaton, 1 White & W. Civ. Cas. Ct. App. § 488; Echols v. Dodd, 20 Tex. 190, 191.

[2] Also that:

"When a servant has authority to do a certain thing, and in attempting to do it he does a wrong, the master is liable for the wrong. If the servant is not acting within the scope of his authority, and not in the master's interest, the master is not liable." Houston, etc., Ry. Co. v. Bowen, 36 Tex. Civ. App. 165, 81 S. W. 80.

A master can only be held liable for the wrongs of his servant, when they are done in the master's account, or for his purpose, and are within the general authority of the servant. St. Louis S. W. Ry. Co. v. Mayfield, 35 Tex. Civ. App. 82, 79 S. W. 365.

[3] Ordinarily a master is not liable for an injury resulting from the willful and malicious acts of his agent not done in the course of his employment. Dillingham v. Russell, 73 Tex. 47, 11 S. W. 139, 3 L. R. A. 634, 15 Am. St. Rep. 753; Ingram v. Linn, 4 Tex. 266–269.

It has been said also that the test by which to determine the liability of the master in all cases (like the present) is, Was he (the servant) acting in the course of the service at the time he did the act? If so, the master is responsible, but, if he had stepped out of the course of the service, the master is not responsible. Texas, etc., Ry. Co. v. Wood-

all, 2 Willson, Civ. Cas. Ct. App. §§ 471–475; Echols v. Dodd, 20 Tex. 190, 191.

"If the servant steps aside from his master's business, for how a short time soever, to commit a wrong not connected with such business, the relation of master and servant will be deemed to have been for the time suspended; the act will be treated as the personal act of the servant, and he alone will be responsible for it." New York, etc., Ry. Co. v. Sutherland, 3 Willson, Civ. Cas. Ct. App. § 140.

[4] Again, an express, willful intent to do an injury resulting in damages cannot be imputed to the principal, when the injury was inflicted by an employé, and when the wrongful act has neither been authorized or ratified. Houston & T. C. Ry. Co. v. Cowser, 57 Tex. 293.

[5] Appellee has indeed filed an able and exhaustive brief, in addition to his oral presentation of the case to this court. But we believe that the question of liability of the master in this case was a question for the jury to decide upon appropriate instructions by the court. Believing as we do, that this was not done, we sustain appellant's second assignment, and the case is reversed and remanded for a new trial.

Reversed and remanded.

---

☞For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes