The ATCHISON, TOPEKA AND SANTA FE RAILWAY COMPANY, Appellant,

v.

PORT OF BEAUMONT NAVIGATION DISTRICT OF JEFFERSON COUNTY, Texas, Appellee.

No. 7021.

Court of Civil Appeals of Texas.

Beaumont.

Feb. 27, 1969.

Rehearing Denied March 21, 1969.

Chilton O'Brien, Beaumont, for appellant.

Peterson & Neumann, Beaumont, for appellee.

KEITH, Justice.

The appeal is from a judgment entered after a motion to disregard one finding of the jury had been sustained, awarding Port of Beaumont (hereinafter called "Port") $6,300.00 for damages to one of its diesel electric cranes. The railway (which will be designated simply as "Santa Fe") was engaged in switching operations in the Port moving the loaded and unloaded cars about the Port facilities as directed by Port's dock superintendent. For these services, Santa Fe received a portion of the "line haul" tariff from the several railroads serving the Port.

The Port had three cranes standing on a short, dead-end spur track connected with the other tracks serving the Port. The crane nearest to the track connection, the

diesel electric crane which was damaged, was being repaired and was not operative. The next crane to it was a steam powered crane which the Port desired to use elsewhere on the Port properties.

Port's dock superintendent, Walters, asked Santa Fe's engine foreman, Beasley, to move the diesel electric crane out of the spur so that Walters could move the steam crane out to its place of use. Beasley had Santa Fe's switch engine hook onto the diesel electric crane to pull it out. Unfortunately, the boom on the diesel electric crane was at an angle of about forty-five degrees, and while being pulled by the switch engine, encountered some high wires, pulling the boom therefrom causing the damage for which Port sued Santa Fe.

The jury found, in answer to Special Issue No. 1, that the crew of the switch engine was acting in the course and scope of its employment by Santa Fe at the time the crane was moved; but, in answer to the next issue, the jury found that Port had "temporarily borrowed" Santa Fe's crew to move the crane. The jury found Santa Fe guilty of negligence proximately causing damage to the crane in the amount of $6,300.00.

Santa Fe moved for judgment on the verdict, while the Port moved the court to set aside the answer to Special Issue No. 2, finding that Port had temporarily borrowed the switch engine and crew, and for the entry of judgment on the remainder of the verdict. After due notice, the court granted Port's motion to disregard, denied Santa Fe's motion for judgment, and entered judgment in favor of Port for $6,300.00, from which this appeal is taken.

The instruction accompanying Special Issue No. 2, while long, is material to a discussion of the cause and is set out exactly as given:

"In connection with the foregoing issue you are instructed that employees in the general employment of one employer may be temporarily borrowed by another for special services and still remain in the general employment of the general employer. Such employees are 'borrowed' if, in obedience to the direction of the general employer, in the performance of the special services they are under the direction and control of the borrowing employer. It is not necessary for the borrowing employer to actually exercise direction and control over the details of the performance of the special services, the borrowing employer may trust the judgment and experience of the borrowed employees to accomplish the task. The fact that the general employer paid the employees for the time they worked as borrowed employees is immaterial in determining whether the employees were under the direction and control of the borrowing employer in performing the services for which they were loaned.

"If the general employees of one employer are placed under control of another employer in the manner of performing their services, they become his special or borrowed employees. If the employees remain under the control of their general employer in the manner of performing their services, they remain employees."

By its first point, Santa Fe contends that it was error for the trial court to set aside the jury's answer to the second special issue finding that Port had temporarily borrowed the switch engine and crew. Santa Fe contends that this answer was supported by adequate pleading and the evidence. The Port answers by the assertion that the jury's finding "was not supported by any evidence."

With commendable candor, counsel for the Port makes these admissions in his brief:

"Admittedly, Mr. Walters, the Port of Beaumont Dock Superintendent, testified on cross-examination many times that at the time the movement in question was being made the switch engine crew was under his direction and control, but [argues the Port's counsel] a thorough reading of all the testimony will reveal to

the Court the true context of Mr. Walters' testimony and the fact that he was merely testifying that he, as the Port's dock superintendent, had the right to request that the Santa Fe switch crew perform an act."

Our review of Walters' testimony does not lead us to agree with the argument of the Port's counsel. Walters not only testified many times that the engine crew was under his direction and control, he made it clear that such was the case at the time of the ill-fated movement of the crane. We continue our résumé of the admissions of Port in its brief:

"After viewing the evidence in a light most favorable[1] to Appellant, Santa Fe Railway Company, the Appellee admits that the testimony in the trial of this Cause shows that a representative of the Port of Beaumont directed the Santa Fe switch crew to move the crane that ultimately came in contact with overhead cables; that such representative ordered such move to be made; that such switch crew was obeying the Port's order when such movement was made, and that such movement was being made at the Port's instruction. The Port of Beaumont further admits that under its arrangement with the Santa Fe Railway Company it had the right to tell the switch crew in question to make the move in question. Appellee admits that all the testimony in this cause, be it by Mr. Walters [Port's dock superintendent], Mr. Beasley [Santa Fe's engine foreman], Mr. C. C. Smith [switch engine operator], or Mr. Meers [sic] [Santa Fe's local freight agent], was to the effect that the *Port of Beaumont had the right to direct, instruct, or order the move to be made * * *"* (Bracketed material and emphasis supplied).

The Port contends, however, that the critical question was not the right to direct the *movement*, but the "right to control the manner and detail in which the Santa Fe switch crew and engine would perform the tasks the Port directed * * *"

There is little dispute between the parties as to the rule of law applicable to the question of loaned employee both parties citing Producers Chemical Co. v. McKay, 366 S.W.2d 220 (Tex.Sup., 1963). The critical question is, under *McKay*, the *right of control of the manner* in which the employees perform the services necessary to the accomplishment of their ultimate undertaking, the court saying:

" * * * If the general employees of one employer are placed under control of another employer in the manner of performing their services, they become his special or borrowed employees. If *the employees remain under control of their general employer in the manner of performing their services, they remain employees of the general employer* and he is liable for the consequences of their negligence. * * *" (366 S.W.2d at 225).

Since it is "settled that a general employee of one employer may become the borrowed servant of another in performing acts on behalf of the latter,"[2] we must determine who actually had the "control of the manner" in which the work was performed. The many cases cited to us in the briefs are not too helpful for in each instance there was some type of contractual agreement between the general employer and the one sought to be held as the special employer. Here, Santa Fe, the admitted general employer, not only had no contractual agreement with reference to the movement of the crane, no one other than the particular switch crew in question even had knowledge that the movement of the crane was to be undertaken as a gratuitous gesture on the part of the crew.

---

1. We have reviewed the record here from such position. Burt v. Lochausen, 151 Tex. 289, 249 S.W.2d 194 (1952).

2. Quoted from J. A. Robinson Sons, Inc. v. Wigart, 431 S.W.2d 327, 330 (Tex. Sup., 1968).

The reference by our Supreme Court to 1 Restatement of Agency 2d, § 227 [in *McKay* and in *Wigart*], is not too helpful here. Both cases involved the use of equipment furnished by the general employer pursuant to contract, and it was the operation of the leased equipment which caused the injury in each instance. In *McKay*, the faulty compressor operated by Producer's employee caused the injuries for which suit was brought while the truck driver's actions in *Wigart* brought about the death there in issue.

The large switch engine involved here represents a type of equipment not found in our review of the reported decisions. No one in Port's employ had any knowledge of how to operate the equipment, insofar as shown by this record. The details of the movement were controlled exclusively by Santa Fe general employees. It was Santa Fe's engineer who operated the switch engine and this he did pursuant to signals from other members of the switch crew. The best that can be said about the Port's authority to control the manner of accomplishment of the result was that Walters did tell the Santa Fe engine foreman to move the electric crane from its place on the spur track to the Molasses track. All of the details of how this was to be accomplished were left to Santa Fe's crew, exclusively.

It is said in § 227 of the Restatement:

"Whether or not the person lent or rented becomes the servant of the one whose immediate purposes he serves depends in general upon the factors stated in Section 220(2) * * *"

Turning to the section mentioned, Section 220(2), we find that these are the factors mentioned:

"(2) In determining whether one acting for another is a servant or an independent contractor, the following matters of fact, among others, are considered:

"(a) the extent of control which, by the agreement, the master may exercise over the details of the work;

"(b) whether or not the one employed is engaged in a distinct occupation or business;

"(c) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision;

"(d) the skill required in the particular occupation;

"(e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work;

"(f) the length of time for which the person is employed;

"(g) the method of payment, whether by the time or by the job;

"(h) whether or not the .work is a part of the regular business of the employer;

"(i) whether or not the parties believe they are creating the relation of master and servant; and

"(j) whether the principal is or is not in business."

Considering the fact that this informal movement of the crane was not the result of any agreement between the parties, Port and Santa Fe, was for a very short period of time, involved a large and expensive switch engine entrusted by Santa Fe to its regular employees who operated it all during the fateful period of time, we are of the opinion that the switch crew remained general employees of Santa Fe and did not become special employees of Port.

Although the record is silent on the subject, the operation of the switch engine by the Santa Fe crew was undoubtedly retained by Santa Fe. As was stated in *Wigart*, 431 S.W.2d at 332:

" * * * The truck was an expensive and complicated piece of equipment, re-

quiring an experienced operator, and it is thus inferable that Robinson intended for its drivers to protect the equipment and not submit to the control of an inexperienced special employer. See 1 Restatement of Agency 2nd § 227, Comment c, at pages 501–502. In addition, Robinson retained the normal employment controls of paying its drivers and discharging them if necessary. Boman-Chase had no right to discharge Britain or substitute another driver of Robinson's truck. * * * "

All these comments made there are applicable here. In addition, in *Wigart* (held to be a close question), plaintiff's decedent met his death at a time when he was actually participating in the direction of the manner of accomplishing the result sought —the shaking off of the house from the truck.

The leading cases relied upon by Santa Fe in this appeal are all discussed at length in *Wigart*, and further discussion would only lengthen this opinion unnecessarily.

However, Santa Fe would avoid the effect of *McKay* and *Wigart* by invocation of the rule that actual exercise of the right of control is not essential where the special master is willing to rely on the experience and skill of the loaned servant, citing 35 Am.Jur., Master & Servant, § 378, p. 802; 56 C.J.S. Master & Servant § 330, p. 1092; and Grandstaff v. Mercer, 214 S.W.2d 133 (Tex.Civ.App., 1948, writ ref. n. r. e.).

The effort so made cannot succeed for the simple reason that it assumes the existence of the right to control the *manner* of performing the work. Here, at best, the dock superintendent of the Port simply sought to have the crane moved from one spot to another. He did not control the details of how this was to be accomplished

and the manner of its accomplishment was solely with Santa Fe's regular employees.

Santa Fe's first point is overruled.

By its second point, Santa Fe contends that because "all of the testimony" showed that its switch engine crew, when undertaking to move the crane, was not acting in furtherance of Santa Fe's affairs and was not acting in the course and scope of its employment with Santa Fe, the trial court erred in overruling its motion for peremptory instruction. The third point claims that there was "no evidence" to support the *submission* of Special Issue No. 1 (course of employment of the Santa Fe crew). The fourth point asserts that the answer to Special Issue No. 1, that Santa Fe's crew was acting in the scope of employment "has no support in the evidence, is not supported by sufficient evidence, and is against the overwhelming weight and preponderance of the evidence." [3]

We sustain the second and third points, making it unnecessary for us to discuss the remaining points in detail.

Special Issue No. 1, answered by the jury favorably to the Port, inquired if at the "time the railroad switch engine crew moved "the *ports* [sic] locomotive crane, they were acting in the course of their employment for the defendant, Santa Fe Railroad [sic] Company." The standard instruction as to course of employment is not complained of by either party. The motion for peremptory instruction of Santa Fe contained only the one ground which, in essence, tracked its pleadings that in moving the crane the crew was not in the course of employment with the railroad. These pleadings are discussed more in detail in the succeeding paragraph. The objections to this issue were full, complete, precise, and adequate to raise the complaint

---

3. Under our determination of the case, we do not find it necessary to discuss the fourth point and its multifarious nature, and requiring the court to evaluate and study the evidence from more than

one standpoint or by different criteria. Rule 418; Crawford v. Continental Panhandle Lines, Inc., 278 S.W.2d 566, 568 Tex.Civ.App., 1954, no writ).

which we are required to discuss under the second point.

Port alleged in three separate instances in its trial pleading that the members of the Santa Fe switching crew were "acting in the course and scope of their employment" with Santa Fe when making the movement with the electric crane. This was not only proper, but necessary if Port was to recover from Santa Fe under the doctrine of respondeat superior for the negligent acts and omissions of the crew. Santa Fe, in addition to the general denial, plead specifically: that Port at the time and place in question "had temporarily borrowed defendant's switch engine and the accompanying crew, * * * and were directing and controlling the movement of such crane by the switch engine crew, * * * and * * * accordingly the borrowed switch engine crew had temporarily left the course and scope of their employment with this defendant and were not at the time of the damage to said crane under the control and direction of this defendant, * * *"

There is little dispute between the parties as to what actually happened or the acts of the respective employees of plaintiff and defendant. The dispute is as to the legal status of Santa Fe's employees at the time of the occurrence, the resolution of which is a matter of law.

■ In considering and deciding the question presented by this point, we follow the familiar rule that credit is to be given to all evidence favorable to Port, every legitimate conclusion favorable to it indulged, and all adverse evidence disregarded. Texas & Pacific Ry. Co. v. Hagenloh, 151 Tex. 191, 247 S.W.2d 236 (1952). Only four witnesses testified to any material facts relating to this facet of the suit, Port's dock superintendent, Walters; Santa Fe's engine foreman, Beasley; its engineer, Smith; and its freight agent, Mears. In analyzing the evidence, we do so by taking as a major premise: the switch crew was in the general employment of Santa Fe, was hired, supervised, and paid by Santa Fe, which alone retained the right to discharge it. Such is implicit from our analysis of the evidence on the first point, wherein we agreed with the trial court that the crew had not become the special or loaned employees of the Port. But, the fact that they were not loaned employees of Port while undertaking the movement of the crane does not establish that they were in the course of their employment for Santa Fe in so doing.

Counsel for the Port calls to our attention the testimony of its dock superintendent, Walters, wherein he was asked what the Santa Fe switch crews were required to do at the Port, to which Walters answered:

"A. Well, they switch the loaded cars to the Port for our unloading and they switch the empty cars that are unloaded, out. In other words, they as we unload boxes, they switch them out and replace them with loads so they can be unloaded into the warehouses.

* * * * * *

"Q. How do they get their instructions as to what needs to be done down there?

"A. Well, we give them—the dock office gives them written orders that comes from the dock superintenddants [sic] office. They are given a list of cars by car numbers and the locations where they are to be spotted.

"Q. Now, these are—are they called switch lists at times?

"A. Yes, sir.

"Q. Are there any times that things need to be done that aren't on the switch list?

"A. Yes, there is some isolated cases that we would require the switch

engine to perform that we wouldn't give them written orders.

"Q. And how would those be given?

"A. Well, by oral, usually b*e* [sic] myself or my assistant, at that time.

\* \* \* \* \* \*

"Q. Once these railway company employees get their switch lists, other than to tell them a few a*m*mend-ments [sic] or changes or additional things you want them to do, orally, did they receive any further supervision from the Port of Beaumont employees?

"A. No, sir."

We now proceed to summarize the testimony brought forward by the Port in its effort to sustain the finding of the jury. Quoting from the testimony of Beasley, Santa Fe's engine foreman, Port established that the switch crews at the Port classify cars, spot cars, move cars in and out, whatever work there is to be done with a switch engine. Beasley got his instructions from the Port Superintendent, stevedores, their representatives, a clerk for one of the stevedores, or someone from the Port Office. He received switch lists when he went to work showing every car and where they were located. Then, during the day, orders were given as to where to spot the cars or what cars to pull out from under sheds or spots. He said that "in fulfilling these instructions" he works "under the supervision of the train master and the yard master on the Santa Fe. But when they send me to the Port of Beaumont or to Jones Feed or to the shipyard, I do anything anyone has to be done."

Beasley said that he was not sure that he had ever moved this particular crane before but he had moved cranes at the Port on prior occasions. Likewise, Beasley stated that his railway company yardmaster gave him instructions to go to the Port of

Beaumont and "I go down there to give them services."

Port calls to our attention the testimony of Santa Fe agent, Mears, who testified that the instructions to the switch crew were "to go to the Port and to perform the switching at the Port that is required by the people in charge of the Port." It was Mears who testified that the switch crew had never been directed to move Port's equipment; but, on the otherhand, he did not testify that they had been instructed not to move other pieces of Port equipment.

Finally, Port calls to our attention the fact that on occasion when Santa Fe moved rolling stock belonging to Port, it made a charge therefor—principally for moving cars of scrap iron.

Mears, a Santa Fe witness, testified without contradiction that the movement of cars by the railroad was controlled by Interstate Commerce Commission regulations requiring bills of lading, etc., and that no payment is ever made by the Port to the railroad for the switching operation. Santa Fe is paid by receiving a portion of the "line haul" tariff from each of the several roads serving the public, such charges being paid by the shippers, not the Port. No bill of lading was ever issued on the crane movement; and, according to Mears, its movement without the bill of lading was in violation of the Interstate Commerce regulations.

No one contends that Santa Fe officials, other than those composing the switch crew itself, ever had any knowledge of, or gave consent to, this crane movement.

Granted that all of the witnesses who testified for either party on this facet of the matter were employees of one or the other party, there was no substantial dispute between the witnesses, no contradictions, and on the whole, the evidence is clear, direct, and positive. We, therefore, apply the

rule of law found in Springfield Fire & Marine Ins. Co. v. Wm. Cameron & Co., 96 S.W.2d 788, 790 (Tex.Civ.App., no writ, 1936). See also: Cochran v. Wool Growers Central Storage Co., 140 Tex. 184, 166 S.W.2d 904, 908 (1942).

■ This court can and will take judicial notice of the fact that Santa Fe is one of the larger railroad systems of the nation, operates as a common carrier in interstate commerce, and is subject to the laws of Congress regulating such operations. 1 McCormick & Ray, Texas Law of Evidence, § 188, p. 212. As such, it is subject to and governed by the provisions of 49 U.S.C.A. § 3(1), making it unlawful for any common carrier subject thereto "to make, give, or cause any undue or unreasonable preference or advantage to any particular * * locality, port, port district * * * etc." Severe penalties attach upon proof of violations. 49 U.S.C.A. § 10.[4]

■ The question for decision is simple: was the switch crew, at the time of the attempted movement of the crane, acting in the furtherance of the affairs of Santa Fe in the course and scope of their employment with Santa Fe? The jury found that it was.

We are helped in our approach to this problem by the clear and authoritative opinion of the Fort Worth Court of Civil Appeals in Mitchell v. Ellis, 374 S.W.2d 333 (1964, error ref.), wherein the fundamental rules are simplified and restated. Here there can be no question but what the switch crew was composed of Santa Fe general employees, entrusted with a large and expensive switch engine, and sent to Port's premises to perform specific tasks—and among them was not the movement of disabled cranes for which Santa Fe received no compensation. There is no question but what it was the negligence of this switch crew which proximately caused the damage to the crane.

Nor is there any serious question which may now be raised concerning the vicarious liability of a master for the wrongful or negligent acts of his employees or servants in the course and scope of their employment —as an abstract proposition. It is far more difficult, however, to make a proper application of the law to facts than it is to determine what the law actually is. For instance, the definition of "course of employment" found in the charge contains this as the concluding sentence: "The act [of the servant] must be done in the furtherance of the employer's business and for the accomplishment of the object for which the employees were employed."

Indeed, these words are but a paraphrase of the language used in Echols v. Dodd, 20 Tex. 191, 196 (1857), and the exact language used in International & G. N. Ry. Co. v. Cooper, 88 Tex. 607, 32 S.W. 517, 518 (1895); International & G. N. Ry. Co. v. Anderson, 82 Tex. 516, 17 S.W. 1039, 1040 (1891); and Norvell Service Co. v. Spell, 288 S.W.2d 133, 138 (Tex.Civ.App., 1956, writ ref. n. r. e.).

Port does not seriously contend that the act of the switch crew in moving the crane was in furtherance of the work of Santa Fe, as indeed it could not do successfully. The large and expensive switch engine with the four-man crew was sent by Santa Fe to the Port to do the switching of the cars for which the railroad was being paid by the shippers. The crew was required to switch cars upon which revenue was collected—not to move property of the Port around gratuitously. The object for which the crew was employed was not, we repeat, to move the crane but to move the loaded and unloaded cars. Nor, can it be said that the act of moving the crane was incidental to the work of the crew. Ours is not a

4. There is a presumption that the railroad was conducting its business in a lawful manner. New York Central & H. R. Ry. Co. v. Beaham, 242 U.S. 148, 37 S.Ct. 43, 61 L.Ed. 210 (1916); Fort Worth & R. G. Ry. Co. v. Burns, 242 S.W. 295 (Tex.Civ.App., 1922, error ref.).

case wherein the location of the crane was an impediment to a move required to be made by the crew, as if it were blocking access to a car which must be moved by the crew. It was on the spur track and its movement was solely for the benefit of the Port—not Santa Fe.

The situation presented by this record is such as to bring into play the doctrine so well expressed by Judge Hickman, while still upon the Commission of Appeals in Southwest Dairy Products Co. v. DeFrates, 132 Tex. 556, 125 S.W.2d 282, 283, 122 A.L.R. 854 (1939).

> "It is the firmly settled rule that when a servant conpletely departs from his work to accomplish some purpose of his own not connected with his employment, the relation of master and servant is thereby temporarily suspended and the master is not liable for his acts during the period of such suspension."

See also: Chatwell v. Baker Oil Tools, Inc., 344 S.W.2d 700, 702 (Tex.Civ.App., 1961, no writ).

Granted that *DeFrates* presented the classic illustration of a servant taking the master's vehicle upon a purely personal mission while here the switch crew was performing an act for the Port and not for their own benefit, the rule of law is the same. In neither instance can it be said that the act resulting in the injury was in furtherance of the employer's business or for the accomplishment of the object for which the servant was employed. See Mitchell v. Ellis, supra, 374 S.W.2d at 336, from which we take this quotation:

> "For an act to be in the course and scope of a servant's employment it is necessary that, (1) it be done within the scope of the general authority of the servant, (2) in furtherance of the master's business, and (3) for the accomplishment of the object for which the servant is employed.
>
> "Proof of such act necessarily requires that any suggestion by the evidence that the act was done while the servant was on a purely personal errand of his own be countered and overcome by evidence. * * *

> "In our opinion the plaintiff in this case failed to meet the burden of proof required of her. * * * He [the servant] was doing nothing to further the master's business or to accomplish the object for which he was employed. *His master's business was at a complete standstill* while Drane attended to his own pleasures." (Emphasis added).

Our case is somewhat like that of Wood v. Mullins, 282 S.W.2d 243, 245 (Tex.Civ. App., 1955, writ ref. n. r. e.) wherein the employee having given directions to a third person's employees became fearful that he had mis-directed them, sought to follow them so that he could be certain that they did not get into trouble. While so engaged, the accident occurred, and the court said:

> "It appears to be well established that where the servant actually turns away from the master's business and changes the course of a vehicle, unmistakably appropriating the vehicle for a use unrelated to the master's interest, and for the exclusive purpose of aiding a third person in distress, such a deviation amounts to a temporary leaving of the scope of employment, and the immediate and succeeding acts are not chargeable to the master. Bragg v. Hughes, Tex. Civ.App., 53 S.W.2d 151; Smith v. Al Parker Securities Co., Tex.Civ.App., 74 S.W.2d 687."

The so-called "Good Samaritan" rule was repudiated in Smith v. Al Parker Securities Co., cited in *Mullins,* supra, and Santa Fe now finds itself not only not thanked by the Port for the gratuitous acts of its train crew, but "has been drawn into court to be held liable for damages resulting from such act of kindness" on the part of its crew. See also: Spradley v. United States, 119 F.Supp. 292 (D.C.N.M., 1954); and 6 Blashfield Automobile Law and Practice (3rd Ed.) § 253.39, p. 180. 51 A.L.R.2d, § 8, p. 39 (1957).

The fourth case filed in this court after its creation in 1915, was Gulf, C. & S. F. Ry. Co. v. Besser, 181 S.W. 253 (Tex.Civ. App., 1915, no writ), and we find this holding at p. 256:

"It has been said also that the test by which to determine the liability of the master in all cases (like the present) is, Was he (the servant) acting in the course of the service at the time he did the act? If so, the master is responsible, but, if he had stepped out of the course of the service, the master is not responsible. * * *"

This statement of the law, neither new nor novel at the time it was made, is still the law of Texas and we choose to follow the earliest expression of *this* court on the subject.

Under the undisputed evidence, the Santa Fe crew, at the time it was engaged in moving the crane, was not engaged in the furtherance of the master's business, nor was the movement of the crane an object for which the crew had been employed. The trial court, therefore, erred in overruling Santa Fe's motion for peremptory instruction, for which reason the second and third points are sustained.

We have carefully examined all of Santa Fe's remaining points and, in our opinion, none reflect reversible error, and each is, therefore, overruled.

■ There is no suggestion or indication that the case was not fully developed upon the trial below. Being convinced that the trial court erred in overruling Santa Fe's motion for peremptory instruction, it becomes our duty to render the judgment which the trial court should have rendered, that plaintiff take nothing. Rule 434; Great Plains Oil & Gas Co. v. Foundation Oil Co., 137 Tex. 324, 153 S.W.2d 452 (1941); H. E. B. Food Stores v. Rodgers, 385 S.W.2d 626, 629 (Tex.Civ.App., 1964, no writ).

Reversed and rendered.